**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CIV 09-2468-PHX-MHB |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| $9,250.00 in U.S. Currency, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

Pending before the Court is Plaintiff United States of America's Motion to Strike Claim and Answer of Claimant Jessica Vazquez. (Doc. 21.) After considering the arguments of the parties in their briefing, the Court now issues the following ruling.

## BACKGROUND[1]

On June 22, 2009, the Phoenix Police Department Commercial Narcotics Interdiction Unit ("CNIU") at Phoenix Sky Harbor International Airport received information regarding arriving passengers Destin White ("White"), Charles Williams ("Williams"), and Antoine Cooper ("Cooper"). The information indicated that White, Williams, and Cooper each had a one-way ticket on a US Airways flight from St. Louis, Missouri to Phoenix, Arizona, and the airline tickets were booked and purchased within twenty-four hours of departure by the same person, with the same credit card. The men were reported to each have one checked

---

[1] The following facts are derived from Plaintiff's Verified Complaint for Forfeiture *In Rem*, Claimant's Claim and Answer, Plaintiff's Motion to Strike, and Claimant's Opposition to Plaintiff's Motion to Strike. (Docs. 1, 14, 15, 21, 24.)

bag. CNIU Detective Travis Bird ("Detective Bird") waited at the gate in Phoenix for the men to exit the aircraft.

Among the passengers who arrived in Phoenix on the US Airways flight from St. Louis, were three men who began to walk through the terminal side-by-side as if they knew each other. The men were later identified as White, Williams, and Cooper. Sergeant James Cope ("Sergeant Cope") went to the baggage carousel where the luggage would arrive. He observed the three men, and believed they knew each other because of the way they were talking to each other.

When the bags began to arrive, White, Williams, and Cooper were seen taking the first three bags from the carousel, and walking away. At this point, Detective Bird identified himself to them. Detective Bird spoke with Williams and Sergeant Cope spoke with Cooper. White started to walk past Williams, Cooper, and the officers. White was asked by Detective Bird if he was with "the other two passengers." He stated that he did not know Williams or Cooper, and walked away.

Shortly thereafter White was approached by Sergeant Cope, and during their conversation, White admitted that he knew Williams and that they were traveling together, but he claimed that did not know Cooper.

In the course of the ensuing investigation the officers asked each of the three men if they had any drugs or large amounts of cash. White stated, "I don't have anything like that, check my stuff if you want." He also gave Sergeant Cope permission to search his carry-on bag. White was then asked if he had any large sums of money. He replied, "I got about fifteen." White was asked, "fifteen what?" He replied, "fifteen thousand ... ," referring to his carry-on bag. Officers subsequently located thirty-eight bundles of cash in White's possession totaling $70,900.00.

In his contact with officers, White was described as nervous and anxious. At one point the officers observed his hands shaking. White stated that he was a rap star known as "Yowda," and the money was payment for his performances at rap concerts. He indicated

that he was paid in cash for performances in Kansas City on June 19 and 20, and in Topeka, Kansas.

Williams, possessed $9,250.00 in cash on his person in a Bank of America envelope. Initially, he stated that the money was his. Later, he changed his story and said some of the money came from his mother. Using a number supplied by Williams, officers spoke to an individual identified as Felicia Williams. She stated that she had given Williams $1,700.00. Finally, after being told that Cooper had told officers that he had given money to Williams, he admitted that some of the money came from Cooper. Williams did not say how much of the $9,250.00 he received from Cooper.

When asked why he had so much cash, Williams stated that it was to be used for expenses while in Phoenix, and to buy a sewing machine and other supplies for an upholstery job that he and Cooper were going to be doing in the Phoenix area. Williams said they were to do upholstery work on a boat. He stated that his cousin, Michael Lawrence, set up the upholstery job for them. The phone number he provided, however, was not to an individual named Michael Lawrence. The party who answered indicated that it must be a wrong number.

Cooper had $8,065.00 in cash on his person in a Bank of America envelope. He said that he preferred to do business in cash, so that he did not have to pay taxes. He stated that he had started with $15,000.00, but gave some money to Williams, so that if the money fell out of his bag he would not lose it all. Cooper said the $15,000.00 came from a joint account he had with his girlfriend, Claimant, Jessica Vazquez.

Claimant was contacted using a number provided by Cooper. When Claimant answered the phone, she said, "who" when asked if she knew Cooper. When asked again if she knew Cooper she said, "no why?" When the detective told Claimant that he was talking to Cooper, and Cooper claimed that she had given him money out of a joint account, she replied "no, what was his name again?" The detective again told Claimant that he was talking about Cooper. She then said "oh yeah, I know him, sorry I am at work." She went

on to tell the officer that she gave Cooper the money from her account, that they did not have a joint account, and that she understood the money was for Cooper's upholstery business. Cooper also stated that he was in Phoenix with Williams for an upholstery job for a relative of Williams and that the money was for the purchase of supplies and a sewing machine.

The currency found with White, Williams, and Cooper was, subsequently, seized and examined. Echo, a two-year-old black Labrador Retriever who is currently certified with the National Narcotics Detector Dog Association and the National Police Canine Association, detected the presence of one or more odors consisting of marijuana, methyl benzoate (a byproduct of cocaine), heroin, or methamphetamine, on the seized currency.

Subsequently, on November 25, 2009, Plaintiff initiated the instant action to forfeit $9,250.00 in United States Currency seized from Williams and $8,065.00 in United States Currency seized from Cooper to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 881(a)(6), 31 U.S.C. § 5317(c)(2) and/or 18 U.S.C. § 981(a)(1)(A). White, Williams, and Cooper were notified of the intent to have the money forfeited. None of the men filed a claim. Claimant, however, filed a claim to only a portion of the money carried by Cooper and Williams. She claimed $7,500.00 of the $9,250.00 found on Williams and $7,500.00 of the $8,065.00 found on Cooper for a total of $15,000.00.

Claimant is 27 years old and currently lives in Kansas City, Missouri. In early 2009, Claimant applied for a home equity loan on her primary residence. On February 18, 2009, Claimant received a check in the amount of $52,800.00 from Community America Bank in Missouri as proceeds from the home equity loan, and deposited the check into her personal savings account with Bank of America.

During this period of time, Claimant was involved in a personal relationship with Cooper. She dated Cooper off and on for several years and considered him to be her boyfriend. Cooper worked as an upholsterer and owned an upholstery business. In June 2009, Cooper told Claimant that he would be traveling to Phoenix to handle an upholstery job, but would need approximately $15,000.00 to buy materials and equipment in order to

complete the work. Claimant, subsequently, withdrew $15,000.00 cash from her personal bank account and gave the money to Cooper believing that he would be using the money for the an upholstery job in Arizona.

On April 28, 2010, Plaintiff filed a Motion to Strike Claim and Answer of Claimant. (Doc. 21.) Claimant filed her Opposition to Plaintiff's Motion to Strike on May 17, 2010, and Plaintiff filed its Reply on May 28, 2010. (Docs. 24, 27.)

**DISCUSSION**

In its Motion to Strike, Plaintiff argues that Claimant lacks standing to contest the forfeiture. Specifically, Plaintiff contends that Claimant has nothing more than a general, unsecured interest in the money seized and, as such, she cannot establish that she is an "owner" as required to contest the forfeiture of the currency.

In response, Claimant concedes that general, unsecured creditors cannot establish "ownership" for standing purposes, but alleges that her close relationship with Cooper, Cooper's promise to return the money, and the potential for fraud demand an equitable remedy. Specifically, Claimant states that she is entitled in equity to a determination by this Court that she has standing to file a claim and contest the forfeiture under the equitable doctrine of constructive trust.

The Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983, governs all *in rem* civil forfeiture proceedings commenced on or after August 23, 2000. See United States v. Approximately $1.67 Million in U.S. Currency, 513 F.3d 991, 998 (9th Cir. 2008). Those forfeiture proceedings are also governed by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"). See 18 U.S.C. § 983(a)(4)(A); United States v. $100,348.00 in U.S. Currency, 354 F.3d 1110, 1117 (9th Cir. 2004).

Rule G of the Supplemental Rules, adopted in 2006, permits any person claiming an interest in the property to contest the forfeiture by filing a claim in the court where the action is pending. Also, at any time after the claim is filed and before the close of discovery, the

Government "may serve special interrogatories limited to the claimant's identity and relationship to the defendant property ... ." Furthermore, the Government may move to strike the claim for lack of standing at any time before trial. The motion to strike "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." As further explained by the 2006 Advisory Committee Notes to Rule G of the Supplemental Rules:

> If a claim fails on its face to show facts that support claim standing, the claim can be dismissed by judgment on the pleadings. If the claim shows facts that would support claim standing, those facts can be tested by a motion for summary judgment. If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing. The evidentiary hearing is held by the court without a jury. The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden.

Advisory Committee Notes to Rule G(8)(c)(ii). Here, Plaintiff has presented its Motion to Strike as a motion for summary judgment, including various responses to discovery requests along with other exhibits.

Standing is a threshold issue on which the claimant bears the burden of proof in every civil forfeiture case. See United States v. Real Property Located at 5208 Los Franciscos Way, 385 F.3d 1187, 1191 (9th Cir. 2004). The claimant must establish his standing with admissible evidence because "the danger of false claims in these proceedings is substantial ... ." $100,348 in U.S. Currency, 354 F.3d at 1118-19 (courts require more than "conclusory or hearsay allegations of some 'interest' in the forfeited property").

To establish Article III standing, the claimant must demonstrate an interest in the property sufficient to satisfy the "case and controversy" requirement. See Real Property Located at 5208 Los Franciscos Way, 385 F.3d at 1191; Sierra Club v. Morton, 405 U.S. 727, 731 (1972) (a claimant must possess a "sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy"). A claimant must show "actual

or imminent injury – not hypothetical, conjectural, or abstract injury" in order to establish standing. See United States v. Lazarenko, 476 F.3d 642, 649 (9th Cir. 2007).

Initially, the Court notes that although the term "owner" is interpreted broadly, general creditors, unlike secured creditors, cannot claim an interest in any particular asset that makes up the debtor's estate. See United States v. $20,193.39 in U.S. Currency, 16 F.3d 344, 346 (9th Cir. 1994). Thus, as the parties agree, "federal courts have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property." Id.; see United States v. Four Million, Two Hundred Fifty-Five Thousand, 762 F.2d 895, 907 (11th Cir. 1985), cert. denied, 474 U.S. 1056 (1986); United States v. $47,875.00 in U.S. Currency, 746 F.2d 291, 294 (5th Cir. 1984); United States v. $3,799.00 in U.S. Currency, 684 F.2d 674, 678 (10th Cir. 1982).

The record contains evidence of the following: (1) a photocopy of check in the amount of $52,800.00 from Community America Bank to Claimant as proceeds from the alleged home equity loan; (2) a deposit slip establishing that Claimant deposited a check in the amount of $52,800.00 into an account held with Bank of America; (3) two withdrawal slips (one dated June 16, 2009 and another dated June 17, 2009) from a bank account in the amount of $7,500.00 each; (4) the fact that the money was found on Williams and Cooper in Bank of America envelopes; and (5) Claimant's assertion that she loaned $15,000.00 to Cooper. Claimant, however, has failed to allege and submit any evidence of a secured interest in the funds carried by Williams or Cooper. At most, the record demonstrates that Claimant's status is that of a general creditor.

In light of her status a general, unsecured creditor, Claimant argues that due to her close relationship with Cooper, Cooper's promise to return the money, and the potential for

fraud, she is entitled to a determination by this Court that she has standing to file a claim under the equitable doctrine of constructive trust.[2]

"A constructive trust is a remedial device created by courts of equity to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." Harmon v. Harmon, 613 P.2d 1298, 1300 (Ariz. Ct. App. 1980). The gist of the conduct that leads to imposing a constructive trust is the wrongful withholding of property that unjustly enriches one person at the expense of another. See Turley v. Ethington, 146 P.3d 1282, 1285 (Ariz. Ct. App. 2006); Harmon, 613 P.2d at 1300. Such a trust "arises by operation of law and not by agreement or intention." Turley, 146 P.3d at 1285 (quoting Harmon, 613 P.2d at 1300). Generally, a court may impose a constructive trust when there has been fraud, either actual or constructive, or when there is a confidential or fiduciary relationship, coupled with an express or implied promise to reconvey. See Stoltz v. Maloney, 630 P.2d 560, 563 (Ariz. Ct. App.1981); Harmon, 613 P.2d at 1300 (stating that a constructive trust is "used whenever title to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress or through any other means which render it unconscionable for the holder of legal title to continue to retain and enjoy its beneficial interest" (citation omitted)). A constructive trust must be established by clear and convincing proof of entitlement. See Harmon, 613 P.2d at 1300.

There is no proof in the record, that actual or constructive fraud existed in this case. Further, the Court finds that Claimant's allegation of a fiduciary relationship with Cooper in light the fact that they dated "off and on for several years" unpersuasive. The existence of a family relationship (or an "off and on" dating relationship in this case) without more is not sufficient to warrant imposition of a constructive trust. See Golleher v. Horton, 715 P.2d 1225, 1232 (Ariz. Ct. App. 1985); Stoltz v. Maloney, 630 P.2d at 563; see also Almada v.

---

[2] The parties appear to concede the application of Arizona law even though a portion of the events in question are alleged to have taken place in Missouri. In any event, the courts in both states apply the same principles in imposing constructive trusts.

- 8 -

Ruelas, 393 P.2d 254, 257 (Ariz. 1964). In fact, in cases where a constructive trust has been established, in addition to a family relationship, other factors such as age and infirmity, actual dominance on the part of one of the parties, an established course of management of the grantor's affairs by the grantee, or other similar facts making it inequitable to allow the grantee to prevail, have been demonstrated. See Golleher, 715 P.2d at 1232; Estate of Coffin, 671 P.2d 921, 923 (Ariz. Ct. App. 1983). On the facts of this case, the absence of proof of great intimacy, trusting of power, superiority of position and the like, the Court will not impose a constructive trust.

Accordingly, having considered the parties' positions and the evidence presented, the Court finds that Claimant has failed to establish standing to assert her claim to $7,500.00 of the $9,250.00 found on Williams and $7,500.00 of the $8,065.00 found on Cooper for a total of $15,000.00. The Court will, therefore, grant Plaintiff's Motion to Strike.

**IT IS ORDERED** that Plaintiff's Motion to Strike Claim and Answer of Claimant Jessica Vazquez (Doc. 21) is **GRANTED**.

DATED this 9th day of August, 2010.

*[signature: Michelle H. Burns]*
Michelle H. Burns
United States Magistrate Judge